## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

James Croud as the Trustee for the Next
of Kin of David Croud,

Case No. 08-CV-5372(PJS/RLE)

Plaintiff,

v.

St. Mary's Medical Center, et. al.,

Defendants.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff James Croud submits this Opposition to Defendant Duluth and its police officers' motion for summary judgment.  For all the reasons set forth herein, the Court should deny that motion.

### MATERIAL BACKGROUND FACTS

On October 12, 2005,  David Croud was 29 years of age. He is survived by his minor children, one brother (Plaintiff James Croud), one sister and his mother.

### MATERIAL DISPUTED FACTS

On October 12, 2005, Duluth Police Officer Shana  Greene (f/k/a Harris) was in downtown Duluth dealing with an intoxicated white male who had medical issues.

1

(Affidavit of Teresa Nelson ("Nelson Aff.") Exh. 1 (Greene Depo p. 19.))  While she was waiting for an ambulance to address his medical needs, she observed a Native American male she later identified as David Croud.  She said she observed him "shadow boxing." (Nelson Aff., Exh. 1 (Greene depo., p. 30 L. 18.))  She radioed dispatch to have another officer check out an intoxicated individual that was "kinda causing a disturbance" Nelson Aff., Exh. 2, page 5 of 911 Transcript).

Defendant Nagorski responded first to Greene's call.  Greene pointed to where she saw the Native American male walk and asked Nagorski to check on him because he was "acting weird".  (Nelson Aff., Exh. 3 (Nagorski depo., p. 57, L. 11-24.))  Greene did <u>not</u> provide Nagorski with information about any specific crimes that the individual had committed.  Nagorski had not received any complaints from any individual and did not observe any crimes committed by the individual.  (Id. at p. 60, L. 5-14.)  Nagorski headed in the direction Greene  had pointed him to where  he located a Native American male he believed was the individual Greene identified.  David Croud was sitting down on a stoop and was <u>not</u> creating a disturbance.  (Id. at pp. 60, lines 21-25 to p. 61 lines 1-12.) Defendant Hamann responded shortly thereafter and Greene told him to follow Nagorski to his location. (Nelson Aff., Exh. 4 (Hamann depo p. 116-17.))

Shortly after the incident, Hamann told BCA investigators that he was responding to a call involving a "drunk disturbance" (Nelson Aff., Exh. 5 (Hamann BCA Statement p. 3.))  During his August, 2009 deposition, Hamann claimed that he was investigating Croud for involvement in a possible assault.  However, Hamann was unaware of any specific victim or incident or any facts that relating to that alleged assault. (Nelson Aff.,

2

Exh. 4 (Hamann depo., pp. 119-128, 130-142 .))  Hamann later told Defendant Greeman that "all they wanted to do was take Mr. Croud to detox."  (Nelson Aff., Exh. 6 (Greeman depo., p. 82.))

Hamann and Nagorski approached Croud.  Croud stood up and started to walk towards the officers. (Nelson Aff., Exh. 3 (Nagorski depo., p. 64 l. 24-5.))  When the officers told him they wanted to talk to them, he did not answer them and began to walk away.  (Nelson Aff., Exh. 4 (Hamann depo., p. 130 l. 13-16.))  Hamann directed Croud to turn around and put his hands on the nearby wall.  (Nelson Aff., Exh. 3 (Nagorski depo., p.  69, L. 20-25.))

Nagorski understood Hamann ordered Croud to put his hands on the wall because he was intoxicated and he wouldn't answer their questions and was starting to walk away. (Id. at pp.  71-73.)  Officers shoved Croud up against the wall and held his hands against the wall while Officer Hamann began conducting a pat search (Nelson Aff., Exh. 7 (Mancini depo., p. 20); Exh. 4 (Hamann depo., p. 140-141); Exh. 3 (Nagorski depo., p. 85-87.))  Croud asked the officers what the problem was and tried to turn his head to make eye contact with the officers.  Officers spun him around and slammed him up against the wall.  (Nelson Aff., Exh. 8 (Kienbaum BCA statement p. 5.))   Officer Hamann decided to handcuff Croud.  Nagorski believed Croud was being cuffed because he was uncooperative by not keeping his hands on the wall.  (Nelson  Aff., Exh. 3 (Nagorski depo., p. 191 L. 18-20.))  Hamann says he decided to handcuff Croud after he tensed up his arms and tried to turn and face the officers and because Croud wouldn't stop and talk to them.  (Nelson Aff., Exh. 4 (Hamann deposition p. 156.))

Nagorski then did a "straight arm" maneuver (Nelson Aff., Exh. 3 (Nagorski depo., pp. 111-112)) and aggressively threw Croud to the ground in a manner that looked like a deliberate attempt to hurt Croud. (Nelson Aff., Exhibit 7 (Mancini depo., pp. 36-38, 127.)) Croud immediately fell forward on his face and was unable to break his fall because the officers held both of his hands behind him. (Id. at pp. 32, 127.) Hamann, losing his balance, fell on Croud. (Nelson Aff., Exh. 4 (Hamann depo., p. 158, L. 10-11.))

Once on the ground, Hamann handcuffed Croud without a struggle by kneeling across his shoulder blades and placing him in handcuffs. (Id at. p. 163 L. 24-5.) After turning him over and getting him into a seated position on the sidewalk, Hamann could see that Croud was injured and bleeding in the area of his face. (Nelson Aff., Exh. 4 (Hamann depo., p. 170.)) His face was covered with blood (Nelson Aff., Exh. 7 (Mancini depo., p. 42 L. 18.)) and there was a pool of blood on the sidewalk. (Nelson Aff., Exh. 35 (Hamann depo. exhibit 7.)) With Croud now cuffed, sitting on the sidewalk, the officers made no attempt to examine him or to determine the extent of his injury. (Nelson Aff., Exh. 4 (Hamann depo., p. 170); Exh. 3 (Nagorski depo., pp. 80-81.)) Both officers took Croud by the arms and helped him up into a standing position. Croud did not fight with the officers as they stood up. (Nelson Aff., Exh. 4 (Hamann depo., pp. 170-171.))

Once Croud was standing up and the officers started walking him to the squad car, he began to spit blood. (Nelson Aff., Exh. 3 (Nagorski depo., p. 116 L. 10); Exh. 4 (Hamann depo., p. 170 L. 16.)) At this time, he was spitting randomly and Nagorski agreed he was unsure whether Croud intended to spit at anything in particular or was

4

simply trying to expectorate blood from his mouth.  (Nelson Aff., Exh. 9 (Nagorski BCA Statement p. 13); Exh. 3 (Nagorski depo., p. 116.))   Mr. Croud  seemed to be trying to get the blood out of his mouth.  (Nelson Aff., Exh. 7 (Mancini depo., pp. 44-45.)) Notably, neither officer was actually spat upon throughout the entire incident. (Nelson Aff., Exh. 3 (Nagorski depo., p. 175); Exh. 4 (Hamann depo., p. 178.))   After getting Croud to his feet, the officers walked him to Hamann's squad car.  (Nelson Aff., Exh. 7 (Mancini depo., p. 42.)) While  officers claim Croud was resisting, neither officer was kicked, nor struck in any way.  (Nelson Aff., Exh. 4 (Hamann depo., p. 211); Exh. 3 (Nagorski depo., p. 173.))

Once at the vehicle, Hamann held Croud against his vehicle while Nagorski went around to open the doors.  When Nagorski came back around, he believed that Croud for the first time spat at him and he then pushed Croud's head onto the trunk of the car. (Nelson Aff., Exh. 9 (Nagorski  BCA Statement pp. 14-15.))  A cabbie reported seeing police slam Croud's head onto the trunk of the vehicle twice and then saw Croud slump down.  (Nelson Aff., Exh. 10 (Winker depo p. 9-10.))   BCA investigators photographed blood smeared on the rear passenger quarter panel of Hamann's squad. (Nelson Aff., Exh. 11 (Hamann depo.,  Exhibit 15.))   Croud passively resisted being placed in the squad car by standing stiff and not moving.  (Nelson Aff., Exh. 7 (Mancini depo p. 45-46.))  Hamann wanted  a Taser to help get Croud into the vehicle.  (Nelson Aff., Exh. 4 (Hamann depo p. 208-9))  Nagorski delivered several knee strikes to the common peroneal area.  Croud's legs buckled and he went down  partially in and partially out of the squad. (Nelson Aff., Exh. 3 (Nagorski depo p. 140.)  Officer Greene arrived and

attempted to Taser Croud.   Greene stated that her Taser battery was dead.  (Nelson Aff.,

Exh. 1 (Greene depo p. 99-100.))  Greene was later unable to say for certain that the

Taser she provided BCA was actually the Taser she used on Croud (Id. at pp. 74-75.)  In

fact, the Taser was unnecessary because Nagorski was able to pull Croud into the car

from the other side of the vehicle (Nelson Aff., Exh. 3 (Nagorski depo., pp. 146-7.)).)

While Greeman was preparing to come to the scene, he heard somebody say that

Croud was spitting blood so he asked if anybody had a spit hood.  (Nelson Aff., Exh. 12

(Greeman BCA Statement p. 3.))  Defendant Radloff responded with a spit sock or spit

hood. (Nelson Aff., Exh. 13 (Radloff depo., p. 33.))  Spit hoods are placed over a

subject's head to prevent any exchange of bodily fluids.  (Nelson Aff., Exh. 6 (Greeman

Depo., p. 396.))  The masks consist of mesh that goes over one's eyes, and a solid, but

purportedly absorbent section that covers one's mouth.  (Id. at p. 395; (Nelson Aff., Exh.

36 (Radloff depo. exhibit 17); Exh. 37 (Radloff depo. exhibit 18); Exh. 38 (Croud

Tranzport Hood photos).

When Defendant Radloff arrived, Greeman was on the scene.  Greeman directed

Radloff to the squad car left rear door.  (Id. at pp. 34-5.)  Radloff pulled the spit hood on

Croud with assistance from Greene. (Nelson Aff., Exh. 14 (Radloff BCA Statement);

Exh. 13 (Radloff depo p. 35-36); (Exh. 15 (Greene  BCA Statement.))  The spit hood was

a  Duluth department-issued item manufactured by Safariland.  (Nelson Aff., Exh. 6

(Greeman depo., p. 395.))  Croud was still bleeding when the spit hood was pulled over

his head.  (Nelson Aff., Exh. 4 (Hamann  depo., p. 65.))

Radloff knew that David Croud was bleeding and spitting blood but did not know the source of the bleeding, nor did he examine Croud to determine the source of the bleeding.  (Nelson Aff., Exh. 13 (Radloff depo., p. 39.))  At the time the spit hood was placed on  Croud's head, the officers were not in danger of being spat upon as Croud sat in a squad rear seat with doors and windows closed with a barrier between its front and back seats. (Nelson Aff., Exh. 6 (Greeman depo., p. 68); Exh. 1 (Greene depo., p. 114.))

No officer rendered first aid to Croud before pulling the spit hood over his face and head. (Nelson Aff., Exh. 3 (Nagorski depo., p. 147.))  No officer called for medical personnel to evaluate Croud to ensure that the application of the spit hood would be safe. (Nelson Aff., Exh. 6 (Greeman depo., p. 114.)) The Duluth Police Department issued spit hoods in packages containing specific written warnings and contraindicated or unsafe uses. (Nelson Aff., Exh. 6 (Greeman depo., p. 388); Exh. 13 (Radloff Depo., p. 32.))

Radloff and Greeman have used spit hoods on multiple occasions.  (Nelson Aff., Exh. 6 (Greeman depo., pp. 384, 388); Exh. 13 (Radloff depo., p.32.))  Radloff and Greeman also provided training on the use of spit hoods in the course of their off-duty vocation training law enforcement students at Fond du Lac Community College near Duluth, Minnesota. (Nelson Aff., Exh. 13 (Radloff depo., pp. 13-14); Exh. 6 (Greeman depo., p. 391.))  The spit hood was identified as a Safariland Tranzport Hood.  (Nelson Aff., Exh. 6 (Greeman depo., pp. 412-413.))  The Duluth Police Department purchased them and made them available to officers to take and use under certain conditions.  (Id. at p. 384.)

Radloff removed the spit hood from its original packaging before placing it on Croud's head.  (Nelson Aff., Exh. 13 (Radloff depo., p. 34.))  Safariland Tranzport Hoods are wrapped in a sheet of paper containing instructions with written warnings and sealed in a plastic bag.  (Id. at pp. 135-6.)  The warnings state, inter alia, that spit hoods are contraindicated under conditions where the restrained person is bleeding profusely from the area around the mouth or nose or suffers other medical frailties such as breathing difficulty or vomiting.   (Nelson Aff., Exh. 16 (Radloff depo. Exhibit 19.))   The warnings plainly state that the wearer "must be under constant visual supervision and should NEVER be left unattended."  (Id. e*mphasis in original*).

 Radloff and Greeman were both aware of the warnings to avoid the risk of using a spit hood on a subject who was bleeding in the area of the face and mouth and Greeman knew of the maker's warning that subject must be under constant observation.  (Nelson Aff., Exh. 13 (Radloff depo., pp.  26, 32); Exh. 6 (Greeman depo., p. 388.))

Once the spit hood was in place, Hamann drove Croud to the St. Mary's Hospital with Greeman following behind.  (Nelson Aff., Exh. 12 (Greeman BCA Statement); Exh. 4 (Hamann depo., p. 59.))  Hamann intended to bring Croud to jail and charge him with obstruction of legal process; however, he needed to first be checked out at the hospital because the St. Louis County jail would not accept an arrestee who was bleeding.  (Id. at pp. 221-2.)

When they arrived at the hospital Greeman assisted Croud out of the vehicle because he was still handcuffed behind his back and was unable to use his arms.  (Id. at p.

223.)  Croud was wheeled from the sally port into the hospital and down the hall to an

examination room.  (Nelson Aff., Exh. 6 (Greeman depo., p. 253.))

Defendants claim that they had to struggle with Croud to keep him in the

wheelchair (Duluth Defendants' memorandum at p. 11) however, the St. Mary's Hospital

video surveillance recording that showing Croud being wheeled from the squad car

through the sally port of the hospital,  down the hall into the treatment room, belies this

claim.  Video surveillance tape from the sally port shows Croud being wheeled

backwards by one security guard with Hamann walking nearby with one hand on Croud.

At one point, Croud appears to slump forward.  Greeman and the other security guards

walk a few feet behind the wheelchair.  The video surveillance from the sally port

entrance to the treatment room again shows Croud being wheeled backwards by one

security guard and Hamann with only one hand on Croud. Nelson Aff., Exh. 17.

Upon arrival at the room, Croud again appears to slump forward, this time falling

out of the chair.  Hamann and a security guard lift him back into the chair and he is

wheeled into the treatment room with Hamann holding one shoulder and another security

guard holding his other shoulder.  Nelson Aff., Exh. 17.

In the treatment room, Croud was placed prone on a gurney with the spit hood still

over his face and his hands cuffed behind his back.  (Nelson Aff. Exh. 4 (Hamann depo.,

p. 228-9.))  The gurney had a pillow.  Nelson Aff. Exh. 18 (Pinkoski depo., pp. 65-6);

Exh. 6 (Greeman depo., pp. 202-3.))  At this point, David Croud was placed on his

stomach at the behest of the Duluth police officers on scene, Defendants Hamann and

Greeman. (Nelson Aff., Exh. 19 (SMDC Security Incident Report p. 2); Exh. 10 (Krueger

9

depo., p. 20.))  Greeman told security that Croud  needed to be placed on his stomach due to risk of continued spitting, despite the fact that decedent  was still wearing the spit hood.  (Nelson Aff., Exh. 19 (SMDC Security Incident Report at p. 2.))  Upon arrival at the hospital, Croud complained repeatedly about the spit hood and asked several times that it be removed.  (Nelson Aff., Exh. 12 (Greeman BCA Statement pp. 9, 13); Exh. 21(Minn. Dept. of Health Report at p. 4.))

Initially, Croud was flailing around and trying to get up off of the gurney so his legs were placed in soft restraints and police and security guards held him down.  (Nelson Aff., Exh. 4 (Hamann depo., p. 236-7); Exh. 6 (Greeman depo., p. 134.))  At times Hamann also held him down with his knee on Croud's back.  (Nelson Aff., Exh. 6 (Greeman depo., p. 134.))  Hospital staff was unable to take Croud's vitals (pulse, blood pressure and temperature) because his hands were still cuffed behind his back and the spit hood was still in place.  (Nelson Aff., Exh. (Vogler depo., pp. 10-13.))

Nursing Assistant Vogler made multiple requests to have the handcuffs removed so that she could take David Croud's vital signs.  Id.   Greeman said absolutely not.  Id. Other hospital staff also requested  Duluth officers remove or change the method of restraint allowing Croud to be repositioned so he could be treated and positioned in a medically safe manner.  Nurse Kiesel asked police if the cuffs and spit mask could be removed so Croud could be treated but police officers refused.  (Nelson Aff., Exh.21 (Minn. Dept. of Health Report at p. 3.))

With the number of staff available to assist, Croud could easily have been repositioned reclining on his back with his arms positioned with one up and one down using soft restraints (Nelson Aff., Exh. 18 (Pinkoski depo., p. 54 L. 18-20.))

Croud was given two doses of Haldol to calm him down so that doctors could treat him. (Nelson Aff., Exh. 21 (Minn. Dept. of Health Report at p. 1.)  Greeman suggested the second shot of Haldol. (Nelson Aff., Exh. 19 (SMDC Security Report at p. 2.))  Once the Haldol began to take visible effect, Croud was tranquil and no longer needed to be restrained—certainly not restrained face down.  (Id.; Nelson Aff., Exh. 20 (Krueger depo., p. 31.))  In fact, Greeman could hear Croud snoring. (Nelson Aff., Exh. 6 (Greeman depo., pp. 178-9.)  Croud was no longer spitting (Nelson Aff., Exh. 20 (Krueger depo., p. 20.)) and no longer needed to have the spit hood on his face and head. (Nelson Aff., Exh. 4 (Hamann depo., p. 272.))  Hamann believed that he could have been restrained with wrist restraints on each arm.  (Id. at p. 262).  "One up, one down restraints" would have been "safe for everybody involved" according to Greeman. (Nelson Aff., Exh. 6 (Greeman depo., p. 299.))  However, before Croud was repositioned, Greeman exited the room to attend to some administrative tasks.  (Id. at p. 189.)

St. Mary's Hospital security guard Rick Krueger informed Duluth officers that Croud's face down positioning was not safe and that Croud needed to be repositioned on his back.  Hamann responded he needed Sgt. Greeman's permission to uncuff Mr. Croud, whereupon Hamann went down the hall to confer with Greeman.  When Hamann returned with Greeman, Krueger reiterated his concern about Croud's safety.  Nelson Aff., Exh. 20 (Krueger depo., pp. 31-33.))  Krueger advised Greeman that Croud was

"turning blue" in an attempt to convey the situation was dangerous for Croud.  (Id. at p.

61.)

      Greeman denies ever being asked to remove the handcuffs so that Croud could be

repositioned for his safety.  (Nelson Aff., Exh. 6 (Greeman depo., p. 193.))  Nevertheless,

Greeman says he refused to remove the cuffs because he did not want to have to fight

with him later to get the cuffs back on when it came time to bring him to jail.  (Nelson

Aff., Exh. 6 (Greeman depo., p. 192); Exh. 20 (Krueger depo., pp. 31-33); Exh. 19

(SMDC Security report at p. 2); Exh. 4 (Hamann depo., pp. 263-4.))

Security officer Krueger was aware of the dangers of positional asphyxiation based on of

his law enforcement training at Hibbing Community College.  (Nelson Aff., Exh. 20

(Krueger depo., p. 21.))  Krueger believed that the officers were equally aware of the risk

based on law enforcement training from Greeman and because of Greeman's status as a

police instructor at Fond du Lac Community College.  (Id. at pp. 22-3.)

      When officers made it clear they were not going to remove the handcuffs,

Krueger believed his only option would have been to get a bolt cutter from housekeeping

to cut the cuffs off.  (Id. at p. 50.)  Hamann testified he would not have permitted hospital

staff to remove the cuffs without his permission.  Thus, Hamann and Greeman controlled

the manner in which David Croud was restrained inside the hospital. Nelson Aff., Exh. 4

(Hamann depo., p. 248.))

      The officers and security guards all stepped back out of the room.  (Nelson Aff.,

Exh. 5 (Hamann BCA Statement, pp. 34-5); Exh. 19 (SMDC Security Incident Report at

p. 3.))  While Hamann was posted outside the room, he smelled an odor indicating that

Croud had defecated.  (Nelson Aff., Exh. 4 (Hamann depo., p. 331.))  Hamann and

Greeman remained outside the room until Nurse Shakelton arrived with soft restraints.

Nelson Aff., Exh. 5 (Hamann BCA Statement, p. 38.))  Nurse Shakelton intended to

reposition Croud on his back and replace the handcuffs with cloth restraints even though

police disagreed with his plan.  (Nelson Aff., Exh. 21 (Minn. Dept. of Health Report, p.

4); Exh. 23 (Shakelton depo., p. 27.))

When Shakelton and Hamann entered the room, Croud was no longer breathing

and was nonresponsive.  (Nelson Aff., Exh. 4 (Hamann depo., p. 267.))  Hamann

removed the handcuffs and medical staff began resuscitation efforts.  (Id. at pp. 267-8.)

Croud was placed on life support but did not regain consciousness.  He was removed

from life support and died on October 18, 2005. (Nelson Aff., Exh. 21 (Minn. Dept. of

Health Report at page 1.))

An autopsy was conducted and the medical examiner determined that cause of

death was "anoxic encephalopathy secondary to cardiopulmonary arrest associated with

acute alcohol intoxication and Haldol administration." (Nelson Aff., Exh.24 (Medical

Examiner Final Autopsy Report, p. 4.))  The Medical Examiner noted that "Other factors

which may have had significance in this case include the presence of a spit mask, that he

was lying on his abdomen with arms restrained behind his back while in the emergency

room and the frequency of observation of him… ." (Id. at p. 5)(emphasis added).  One of

Croud's treating physicians, Dr. Aas, concluded Croud first went into respiratory arrest,

then cardiac arrest. (Nelson Aff., Exh. 25 (Aas depo., p. 20); Exh. 26 (Aas depo., exh. 3.))

Plaintiff's medical expert, Dr. Steven Tredal opined:

> [T]o a reasonable degree of medical certainty, Mr. Croud suffered a respiratory arrest secondary to positional asphyxia as a result of prolonged prone, or face-down, positioning while restrained with hands cuffed behind his back, with a partial face mask in place following administration of a total of 15 mg Haldol injection and with a significantly elevated blood alcohol. Furthermore, in my opinion, to a reasonable degree of medical certainty, if Mr. Croud had been repositioned in a supine position, or face-up, in an appropriate timely fashion it is more likely than not he would not have suffered a respiratory arrest with subsequent irreversible brain damage leading to his unfortunate demise.

(Nelson Aff., Exh. 27 (Tredal Declaration.))  After recently examining a Safariland Tranzport Hood obtained by Plaintiff after he prepared his declaration, Dr. Tredal further opined that "any person with basic first responder training would have realized that leaving this mask in place on Mr. Croud when he was already restrained… was dangerous and unnecessary;" and that the spit hood "did in fact impair Mr. Croud's capacity to breathe and, in combination with the other factors identified in my Declaration, did contribute to the respiratory arrest which caused his death."  (Nelson Aff., Exh. 28 Tredal Affidavit.))

Following Croud's  respiratory and cardiac arrest, there were several instances of spoliation of evidence.  Shortly after the incident, Nagorski began dictating a use of force report on a micro-cassette tape recorder.  Before completing the report, he was advised by his attorney to not complete the report.  He then intentionally destroyed the micro-cassette tape containing his partially dictated report by throwing it in the trash. (Nelson Aff., Exh. 4 (Nagorski depo., p. 94-6.))

The initial blood draw used by the hospital to calculate Mr. Croud's blood alcohol content was uncollected by the BCA and subsequently thrown away inadvertently. (Nelson Aff., Exh.29 (BCA Investigative Report.))

BCA investigators did obtain copies of security surveillance video from St. Mary's Hospital; however, their copy lacks any time stamp. When BCA returned to St. Mary's to retry copying the video with the time stamp, agents learned that the video had accidentally been destroyed. Id.

Finally, Defendant Hamann took contemporaneous notes of the incident in his notebook; however, he does not know where the notebook is and believes that it was thrown away when he was done with it. (Nelson Aff., Exh. 4 (Hamann depo., pp. 18, 33.)) Hamann did not prepare an incident report or a use of force report so the notebook was his only contemporaneous record of the incident. (Id. at p. 8.) In response to a request for production of the notebook the defendants confirmed that no such notebook has been located. Nelson Aff., Exh. 30 (Defendants' Response to Plaintiff's Second Request for Production of Documents dated Oct. 23, 2009, p. 2.))

## ARGUMENTS AND AUTHORITIES

### I.    STANDARD FOR SUMMARY JUDGMENT

It is well-settled law that summary judgment may not be granted unless the moving party has met its burden of proving that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute about material facts is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Landon v. N.W. Airlines, Inc., 72 F.3d 620, 624 (8th Cir.1995).

Facts are considered "material" if they "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain which factual issues are material.

Under Rule 56, the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1355-56 (1986).

Indeed, the nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record, and the Court must view the evidence and the inferences in the light most favorable to the nonmoving party. Vette Co. v. Aetna Casualty & Surety Co., 612 F.2d 1076, 1077 (8th Cir.1980); Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir.1996). Indeed, as long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion must be denied. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Basically, summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir.1994). Summary judgment cannot be granted, however, "if there is a genuine dispute concerning predicate facts material to the qualified immunity issue." Greiner v. City of Champlin, 27 F.3d 1346 (8th Cir. 1994) ; Gainor v. Rogers, 973 F.2d 1379, 1384-85 (8th Cir.1992)).

The test for qualified immunity at the summary judgment stage of a proceeding is an objective one: The plaintiff must demonstrate that the law is clearly established and the defendant then bears the burden of showing that his conduct either does not violate plaintiff's rights or that there were extraordinary circumstances and that the defendant neither knew nor should have known of the relevant legal standard. Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir.1989). If the plaintiff can show that the defendant's conduct violated clearly established law, "then the defendant, as the movant for summary judgment, must demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions." Cross v. City of Des Moines, 965 F.2d 629, 632 (8th Cir.1992) (quoting Salmon v. Schwarz, 948 F.2d 1131, 1136 (10th Cir.1991)); Johnson-El, 878 F.2d at 1048 ("The defendant bears the burden of proof with respect to all other elements of the defense").

Defendants err in suggesting that the facts here are undisputed, and that Summary Judgment is warranted. The Plaintiff is entitled to have his claims resolved by a jury because genuine issues of material fact remain and a reasonable jury could conclude that the Defendants violated Croud's clearly established constitutional rights by using excessive and unreasonable force against him, leading to his wrongful death; that the Defendants' actions constituted a conspiracy to deprive Croud of his right to equal protection of the laws; that the City of Duluth had a municipal policy of using unreasonable and excessive force in its police tactics, and that the Defendants are not entitled to qualified and/or official immunity for their actions.

17

**A.      Plaintiff Is Entitled To An Adverse Inference Against Defendants Precluding Grant of Summary Judgment.**

With regard to the facts on the record, this  Court should impose an adverse factual inference sanction on Defendants based upon their spoliation of evidence. (Nelson Aff., Exh. 4 (Nagorski depo., p. 94-6); Exh. 4 (Hamann depo., pp. 18, 33.); Exh. 30).  The Eighth Circuit has not uniformly described the elements supporting sanctions for spoliation of evidence; however, the party seeking sanctions generally must show that the adverse party destroyed potential evidence, Stevenson v. Union Pacific R.R. Co., 354 F.3d 739, 746 (8th Cir. 2004); the potential evidence was discoverable, Lexis-Nexis v. Beer, 41 F.Supp.2d 950, 954 (D.Minn. 1999)]; the loss caused prejudice to the moving party, Dillon v. Nissan Motor Co., 986 F.2d 263, 267 (8th Cir. 1993) and that the destruction was intentional and in bad faith.  Stevenson, 354 F.3d at 746; E*Trade Securities LLC v. Deutsche Bank AG, 230 F.R.D. 582, 588 (D.Minn. 2005).  Bad faith may be inferred when a party knows the value of potential evidence but proceeds to destroy some or all of that evidence. E*Trade Securities LLC, 230 F.R.D. at 590; Lexis-Nexis at 954-55.

In this case, Defendant Nagorski's partially dictated report and Defendant Hamann's contemporaneous notes were made prior to the officer's knowledge that their conduct was the subject of an investigation by the BCA.  As such, the report and notes

contain their impressions of the incident at the time, uncolored by a concern that they may be held responsible for wrongdoing that led to Croud's respiratory and cardiac arrest. This information is plainly relevant to the issues in the case and discoverable. The information was nevertheless destroyed in bad faith. Nagorski intentionally threw his microcassette in the trash after being advised by his attorney that he should not complete the report. Therefore, he was on notice that the contents of the report were not only evidence in the matter, but also a potential source of liability.

Defendant Hamann told BCA investigators about his notebook and they asked to see it; therefore, Hamann was also on notice that the duty notebook was evidence in the matter. This spoliation of evidence has prejudiced Plaintiff because it contained the officer's unfiltered notes and impressions recorded <u>before</u> the Defendants were aware that their conduct might form the basis for criminal or civil liability. Thus, this Court may impose an adverse factual inference that <u>eo ipso</u> raises a material and genuine issue of fact for trial.

A review of the facts, in the light most favorable to Plaintiffs as the nonmoving parties, it is manifest that Defendants' assertions must fail and their motion be denied in its entirety.

<u>**FEDERAL CAUSES OF ACTION**</u>

**II.   <u>DEFENDANT OFFICERS AND CITY OF DULUTH ARE SUBJECT TO LIABILITY UNDER TITLE 42 UNITED STATES CODE SECTION 1985(3)</u>**

**A.   Genuine and material questions of fact remain conspiracy precluding summary judgment on Plaintiff's cause of action under 42 U.S.C. § 1985.**

In order to show a civil rights conspiracy under 42 U.S.C. § 1985(3), Plaintiff must prove: (1) the defendants conspired, (2) with the intent to deprive them, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, and (4) that they or their property were injured, or they were deprived of exercising any right or privilege of a citizen of the United States. Barstad v. Murry County, 420 F.3d 880, 887 (8th Cir. 2005); *See also* Mettler v. Whitledge, 165 F.3d 1197, 1206 (8th Cir. 1999).

A conspiracy within an entity, such as a municipality or corporation, may be established where individual defendants are named and those defendants act outside the scope of their employment. *See* Garza v. City of Omaha, 814 F.2d 553, 556 (8th Cir. 1987). Plaintiff has presented sufficient evidence for a rational trier of fact to conclude that multiple City Defendants acted outside the scope of their employment with an "absolutely shocking and memorable" display of violence. (Nelson Aff., Exh. 7 (Mancini depo., at 59.))

Defendant's assertion that a Plaintiff must assert "specific facts" of a "meeting of the minds" is misleading. Indeed, a Plaintiff need not produce "direct evidence of a meeting of the minds," rather a showing of "specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective" is sufficient. Hinkle v. City of Clarksburg W. Va., 81 F.3d 416, 421 (4th Cir. 1996).

The jury need only to be able to "infer from the circumstances" a meeting of the minds or "understanding among the conspirators to achieve the conspiracy's aims."

White v. McKinley, 519 F.3d 806, 816 (8th Cir. 2008).  A conspiracy "need not be explicit, but may be tacit, based upon the actions of the defendant."  United States v. Smith, 450 F.3d 856, 860 (8th Cir. 2006).  The Plaintiff has alleged that the conduct of the police acting in concert deprived Croud, the decedent, of his civil rights resulting in harm; any inferences as to whether or not such conduct amounts to conspiracy is a material fact for the jury to determine.

The Plaintiff has put forward sufficient evidence for a rational jury to find that the City Defendants acted under an agreement to deprive Croud of the equal protection of the laws.  The Equal Protection Clause requires that the government treat all similarly situated people alike.  Barstad, 420 F.3d at 884.  The Supreme Court recognizes an equal protection claim for discrimination against a "class of one."  Id.  The purpose of a class-of one claim is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  A class-of-one claimant may prevail by showing he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Id.;  see also, Costello v. Mitchell Pub. School Dist. 79, 266 F.3d 916, 921 (8th Cir. 2001).

The Duluth police were called to respond to a white intoxicated man, Payne. (Nelson Aff., Exh. 1 (Greene depo., at 20-21.))  The responding officer, Greene, called other officers to investigate Croud, a Native American. (Id. at 38-40.)  Croud was nearby, but was not the source of the original police response.  (Id. at 39-40.)

There is no apparent or rational reason that Greene felt the need to investigate Croud.  By Greene's own testimony, Croud was merely walking, smoking a cigarette, and making "shadow-boxing" motions not directed at anyone.  (Id. at 50-62.) Additionally, Greene's observations were limited because she had to keep some attention on the source of the 911 call, Payne.  (Id. at 57-58.)

Despite the facts that Greene was preoccupied and nearly a block away (Id. at 32-33), and Croud was not interacting with anyone, and exhibiting behavior that at worst could be characterized as "odd" (Id. at 49), Greene characterized Croud as a "threat." (Id. at 49.)

The disparate treatment between the white man and Native American Croud did not end at their diagnoses.  While Payne, the white man, was solicitously sent via ambulance to the hospital (Id. at 21), Croud was pushed up against a stone wall (Nelson Aff., Exh. 7 (Mancini depo., p. 21,)) and slammed face-first against the sidewalk (Id.  at 33, 37), despite the fact that he was non-confrontational and did not try to strike or harm the investigating officers. (Id. at 34-35.)

The maltreatment continued at the hospital, where the police officers insisted that Croud be restrained face down on a gurney, refusing to place Croud on his back despite the requests of hospital staff. (Nelson Aff., Exh. 20 (Krueger Dep. at 21-26.)   In another display of indifference towards Croud's condition, the officers applied a spit hood, which places solid material in front of the mouth and nose, and then left Croud unattended, completely ignoring the safety procedures required in using the mask (Nelson Aff., Exh. 16 (Radloff depo., exhibit 19.))

The disparity in treatment between Croud and others is also illustrated in a 2006 decision of this Court in Utick v. Greenwalt, 2006 WL 748205 (D.Minn.).  In that case, Duluth police officers, including defendant Radloff, responded to an individual who was having a diabetic reaction.  Utick "was thrashing around and spitting; some of his spit landed on one of the officers, who then put a cloth over his face."  Id at 1 (*emphasis added*).  Once he had calmed down, he was taken to detox rather than jail despite having spat upon one of the officers.  Id.

Statistics gathered by the State of Minnesota on arrests by race and ethnicity indicate that the Duluth Police Department arrests a significantly higher number of Native Americans than their population in the area.   (Nelson Aff., Exh. 31; Exh. 32; Exh. 33.)  According to 2000 U.S. Census data, American Indian and Alaska Native persons comprise only 2.4% of the population in the City of Duluth while whites comprise 92.7%. (http://quickfacts.census.gov/qfd/states/27/2717000.html, *accessed December 4, 2009*).  They comprise only 2.2% of the population of St. Louis County where the City of Duluth is located while white, non-Hispanic people comprise 93.5%. (http://quickfacts.census.gov/qfd/states/27/27137.html, *accessed December 4, 2009*).

In the year 2005, the year David Croud died, the City of Duluth made 3,329 total arrests.  (Nelson Aff., Exh. 31.)  Of those arrests a total of 449 (or 13.5%) were identified as Indian/Alaskan Native. (Id.)  Thus, the Duluth arrest rate for Native Americans and Alaskan Natives is significantly out of proportion to their total population in the relevant city and county.  This disparity is significantly higher than the Minnesota statewide arrest rate for Indians and Alaskan Natives in 2005.   According to the BCA's Uniform Crime

Report for 2005, there were a total of 210,955 arrests statewide in 2005.  Of those arrested, 8690 (or 4%) were identified as Indian or Alaskan Native. (http://www.bca.state.mn.us/CJIS/Documents/Crime2005/2005%20Crime%20Book%20 Revised.pdf, *accessed December 4, 2009*).  A similar disparity can be found in the Duluth arrest data for 2006 and 2007 where Indian or Alaskan natives made up 687 out of a total 4,648 arrests (14.7%), and 703 out of a total 4485 arrests(15.6%) respectively.  (Nelson Aff., Exh. 32; Exh. 33.)

The racial disparity in arrest rates by the Duluth Police Department become even clearer when you consider the small percentage of white arrestees compared to the percentage of minorities arrested.  For example, in 2005, 2,373 Duluth Police Department arrestees (71%) were identified as white.  (Nelson Aff., Exh. 31.)  When one subtracts the 518 arrestees were identified as being Hispanic ethnicity from the total number of white people arrested, the total number of white, non-Hispanic arrestees is only 1,855 (56%). (Id.)

Based on the standard set out in Barstad, Plaintiff has alleged conduct sufficient for a rational jury to conclude the defendants conspired to deprive Croud of equal protection under the law, and that harm resulted therefrom.  A rational jury could also conclude that that the Defendants were motivated by discriminatory animus toward Native Americans.  The Duluth Police Department has significant racial disparities in their arrest rates.  In the instant case, while the similarly situated white man, Payne, was transported to a hospital for medical treatment in an ambulance, Croud was assaulted, unduly restrained, and subsequently ignored.

Any possible dispute as to the conclusions to be derived from these facts precludes summary judgment.  "Courts have long recognized the difficulty in disposing of issues of discriminatory…intent at the summary judgment stage.  'Summary judgments should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion.'"  Davis v. Fleming Cos., Inc., 55 F.3d 1369, 1371 (8th Cir. 1995) (quoting Johnson v. Minn. Historical Society, 931 F.2d 1239, 1244 (8th Cir. 1991)).   Plaintiff  submits the facts preclude summary judgment  regarding  his claims under Title 42 United States Code Section 1985.

III.   **DEFENDANTS ARE NOT ENTITLED TO THE PROTECTION OF QUALIFIED IMMUNITY AS TO THE 1983 CAUSE OF ACTION FOR WRONGFUL DEATH BASED ON EXCESSIVE FORCE AND DELIBERATE INDIFFERENCE.[1]**

   A.   **Defendants Are Not Entitled To Qualified Immunity.**

Defendant officers are not entitled to qualified immunity from standing trial on Plaintiff James Croud's claims for violation of the decedent's constitutional rights under the Fourth Amendment or the right to be free from excessive force.  Particularly with respect to the conduct of Officers Hamann and Nagorski, it is plain that their  conduct in utilizing an overwhelming amount of force in an excessive  and reckless fashion to effect an unsupported (at best highly questionable) misdemeanor arrest violated clearly established constitutional rights.

Qualified immunity shields government officials from liability in a §1983 action

---

[1] Moreover, it plain that Plaintiff's excessive force claim survives under Sections 1983 and 1988 because it is supported by his claims under Minnesota's wrongful death statute. See Andrews v. Neer, 253 F.3d 1052, 1057-58 (8th Cir.2001).

unless the officer's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.  Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006). The reviewing court views the facts in the light most favorable to the plaintiff, accepting as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed.  Id.; see also Walker v. City of Pine Bluff, 414 F.3d 989, 991 (8th Cir. 2005).

Qualified immunity analysis involves an initial two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); see also Pearson v. Callahan, --- U.S. ----, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (holding that courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first).

**B.**     **Plaintiff Has Asserted Violations of Plainly And Clearly Established Constitutional Rights.**

In contrast to the argument of Defendant Officers, Plaintiff Croud has set forth claims that establish violations of clearly established constitutional rights.   Plaintiff asserts first that the conduct of Defendant Hamann and Nagorski (and those assisting him) violated decedent's right to be free from unreasonable seizures.   Said conduct includes the threshold conduct of Officer Hamann in using force after Croud merely

refused to respond to his unwarranted and random inquiry. Subsequent conduct, including Defendants repeated excessive force to subdue and arrest an unarmed Native American male for an apparent misdemeanor of failing to answer an approaching officer's inquiry or not keeping his hands placed against a wall when ordered to by a peace officer, further implicates the unreasonableness of Defendants' actions.

Plaintiff's claims for unreasonable seizure and excessive force involve an invocation of a well-established and clearly-defined constitutional right under the Fourth Amendment to be free from excessive force. The United States Court of Appeals for the Eighth Circuit recently held in Brown v. City of Golden Valley, 574 F.3d 491 (8th Cir. 2009) that in the context of qualified immunity:[2]

> "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances. (internal citations omitted)."

Although the issue before this Court is not precisely identical to that recently before Chief Judge Davis in the Brown case, the determination to be made remains whether the amount of force used was unreasonable "under the particular circumstances." The contours of the Fourth Amendment's protection against unreasonable seizures of the person provide a clearly established right to be free from excessive force during arrest. Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998).

---

[2] To be clearly established, there need not be a case decided on all fours with the present factual circumstances. Wilson v. Lawrence County, 260 F.3d 946, 951 (8th Cir.2001). Rather, it need only be apparent from pre-existing law that the conduct is unlawful. Id.

Moreover, the Eighth Circuit has made it plain that the 'salient question ... is whether the state of the law gave the officials 'fair warning that their alleged [conduct] was unconstitutional.' " <u>Young v. Selk,</u> 508 F.3d 868, 875 (8th Cir. 2007), as cited in <u>Brown v. Golden Valley,</u> 534 F. Supp. 2d 984, 994-95 (Minn. D. 2009).  Therefore, a reasonable officer should be on notice as to the unreasonableness of the use of first, overwhelming physical force where no offense had been committed; a second, use of a Taser application; third, slamming the suspect into the squad car trunk twice; and fourth, the reckless application of a spit hood to a person bleeding from his mouth and/or nose. All carried out in response to an encounter with an unarmed, non-violent misdemeanant intoxicated male arrestee.

Analogously, Minnesota District Judge Montgomery found that the use of a Taser on an uncooperative, cursing and obstreperous prisoner was violative of clearly established constitutional rights.  See <u>Mahamed v. Anderson,</u> 2009 WL 873534 (D. Minn.).  In that decision,  Judge Montgomery adverted to the District Court's decision in <u>Bailey v. County of Kittson,</u>  2008 WL 906349 (D. Minn.) (finding excessive use of a taser on a mentally ill detainee who refused to turn around and stated that he had Hepatitis C and would bite or spit at anyone who approached him) and Chief Judge Davis's decision in  <u>Brown v. City of Golden Valley,</u> 534 F.Supp.2d 984, 994-95 (D. Minn. 2008) (finding that it was clearly established that using a taser on a detainee without warning for failure to end a 911 call was an unconstitutional use of excessive force).

Federal courts recognize, therefore, that the official's exact action need not have

been previously held to be unlawful but rather, "in light of pre-existing law the unlawfulness must be apparent." <u>Champion</u>, 380 F.3d at 901 (citing <u>Anderson</u>, 483 U.S. at 640, 107 S.Ct. 3034); <u>Hope v. Pelzer</u>, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (an official "can still be on notice that [his] conduct violates established law even in novel factual circumstances"); <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 820-21, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (imposing liability "when a public-official defendant 'knew or should have known' of the constitutionally violative effect of his actions").

Viewing the facts in the light most favorable to Plaintiff Croud, even if he was intoxicated and had difficulty being cooperative, he was not dangerous nor aggressive, the repeated use of police-initiated force commencing a chain of events resulting in death violated his clearly established constitutional right to be free from excessive force.

### C. <u>Viewing The Facts in the Light Most Favorable to Plaintiff, Summary Judgment Should Be Denied.</u>

It is abundantly clear from the conflicting statements and testimony that Defendant officers, including Haman, Nagorski, Greeman, and Radloff, are not entitled to summary judgment. Defendants erroneously contend that Plaintiff violently resisted police and that the force used on him was reasonable. None of the officers were injured and witnesses describe Croud's conduct as being uncooperative or passively resistant at best.

A bystander and a cab driver witnessing Officer Hamann's and Nagorski's conduct were shocked by the level and repetition of force used against David Croud—a level of force leading to his injuries and restraint at St. Mary's Hospital—and, ultimately his death.

**D.**    **The Repeated Use of Force and Interference With Medical Treatment by Officers in this Context Was Not the Action of a Reasonably Well-Trained Police Officer.**

The actions of Hamann and Nagorski on the street presaged the unreasonable conduct of Hamann and Greeman in interfering with Croud's medical treatment at St. Mary's Hospital. At least two civilian eyewitnesses observed officers acting with overwhelming violence towards Croud. They watched as Officers spun him around and slammed him up against the wall. (Nelson Aff., Exh. 8 (Kienbaum BCA statement p. 5.)) Officer Hamann decided to handcuff Croud. They watched as Nagorski then did a "straight arm" maneuver (Nelson Aff., Exh. 3 (Nagorski depo., pp. 111-112)) and aggressively threw Croud to the ground in a manner that looked like a deliberate attempt to hurt Croud. (Nelson Aff., Exhibit 7 (Mancini depo., pp. 36-38, 127.)) Croud immediately fell forward on his face and was unable to break his fall because the officers held both of his hands behind him. (Id. at pp. 32, 127.)

On the ground, Hamann handcuffed Croud without a struggle by kneeling across his shoulder blades and placing him in handcuffs. (Id at. p. 163 L. 24-5.) After turning him over and getting him into a seated position on the sidewalk, Hamann could see that Croud was injured and bleeding in the area of his face. (Nelson Aff., Exh. 4 (Hamann depo., p. 170.)) His face was covered with blood (Nelson Aff., Exh. 7 (Mancini depo., p. 42 L. 18.)) and there was a pool of blood on the sidewalk. (Nelson Aff., Exh. 35 (Hamann depo. exhibit 7.)) However, officers made no attempt to examine him or to determine the extent of his injury. While officers self-servingly claim Croud was

resisting, neither officer was kicked, nor struck in any way.  (Nelson Aff., Exh. 4 (Hamann depo., p. 211); Exh. 3 (Nagorski depo., p. 173.))

A cabbie reported seeing police slam Croud's head onto the trunk of the vehicle twice and then saw Croud slump down.  (Nelson Aff., Exh. 10 (Winker depo p. 9-10.)) BCA investigators photographed blood smeared on the rear passenger quarter panel of Hamann's squad. (Nelson Aff., Exh. 11 (Hamann depo.,  Exhibit 15.))  Moreover, the subsequent interference with Croud's medical treatment by Defendants Hamann and Greeman is well documented.[3]

### E.      Defendants Erroneously Argue That  All Claims Related To Excessive  Force Did Not Survive Mr. Croud's Death.

Genuine issues of material fact remain for trial with regard to the role that Croud's restraint, positioning and spit hood played in causing his death.  This Court should not analyze the officers' actions in discrete "lumps" of time; rather this incident is a course of continuing constitutional violations.  Officer Nagorski began the unlawful seizure with Officer Hamann and assisted him in handcuffing Croud behind his back. Hamann unlawfully seized Croud, handcuffed him and kept him unreasonably restrained at the hospital leading to his death.

Federal courts have held that "[t]he seizure that occurs when a person is arrested continues throughout the time the person remains in the custody of the arresting officers."

---

[3] The duty to prevent or assist unwarranted use of force by a law enforcement individual applies to fellow officers. "An officer may be liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir.2002).

Phelps v. Coy, 286 F.3d 295, 300 (6th Cir. 2002) (citing McDowell v. Rogers, 863 F.2d 1302, 1306 (6th Cir. 1988)).  Thus, the entire chain of events must be analyzed for Section 1983 purposes.

Greeman called for the spit hood and directed Radloff to place the spit hood; he directed that Croud be positioned prone on the gurney and refused multiple requests by hospital staff to reposition him and remove the handcuffs or replace them with soft restraints.   Defendants Greene and Radloff's application of the spit hood  was found to be a factor in Croud's death as determined by the St. Louis County medical examiner.

### F.    The Initial Force Used By Defendant Officers Was Objectively Unreasonable.

Genuine issues of material fact remain as to whether or not the force used was objectively reasonable.  Defendants claim that the initial seizure was reasonable but plaintiffs contend that pushing Croud up against the wall, slamming him down onto the sidewalk and handcuffing him, slamming him onto the trunk of the car, attempting to taser him and applying the spit hood were all unreasonable.  (Nelson Aff., Exh. 31 (Bouza Affidavit at p.3.)

Genuine issues  of material fact remain regarding whether Croud was spitting because he needed to expectorate blood to avoid swallowing it or because he intended to spit on the police officers.  With the exception of Radloff getting spit and blood on his gloves when he applied the spit hood, none of the Defendant Officers were spat upon and police did not consider charging him with assault on a police officer so it is unlikely they believed that he intended to spit at them. (Nelson Aff., Exh. 4 (Hamann depo., pp. 178).

**G.**     **The Failure To Properly Follow Manufacturer's Warning In Applying The Spit Hood Prevents The Defendants' Claim To Qualified Immunity.**

Clearly established law illustrates that failure to heed warnings on the spit hood packaging constitutes unreasonable conduct by the officers, precluding qualified immunity.

In <u>Parrish ex rel. Lee v. Cleveland</u>, the Fourth Circuit Court of Appeals analyzed whether or not qualified immunity was available to officers in a wrongful death claim on behalf of the estate of an intoxicated man who died during transport to an adult detention center. 372 F.3d 294 (4th Cir. 2004). The initial factual similarity to this case was that the decedent was wearing a Tranzport hood that was considered a factor in his death, and was handcuffed behind his back putting him at risk for positional asphyxia. The Court analyzed the issue under the deliberate indifference/shocks the conscience standard applicable to pretrial detainees and determined that there was insufficient evidence to show that the officers acted in a subjectively reckless manner. However, the Fourth Circuit panel noted that at most, the officer's "response to a perceived substantial risk was unreasonable under the circumstances".

Importantly, the Court based its conclusions on factors including that the officers did not have any experience using spit hoods and did not appreciate the incremental risk they created by leaving the spit mask in place, and that the officers perceived the general risks posed by the spit hood and positional asphyxia and tried to mitigate those risks by following the recommendations of an EMT.

By stark factual contrast here, both  Greeman and Radloff had experience with spit hoods and were familiar with manufacturer package warnings; the spit hood package included specific warnings that were not heeded by Radloff or Greeman; and Greeman and Hamann ignored the advice/directives of hospital staff.    Plainly, at a minimum, the Defendants acted with deliberate and knowing indifference and in a deliberate disregard of his safety at the hospital, despite entreaties of hospital staff to control the positioning and treatment regimen.  This objective conduct is evidence of their subjective disregard for the contraindicated use of the spit hood and of their interference with the repositioning and restraint mode used on Croud and presents a viable issue for trial.

**H.**   **The Failure To Change Croud's Restraints and Positioning Despite Repeated Requests by Hospital Staff Prevents Defendants Hamann and Greeman's Claim To Qualified Immunity Under the 14th Amendment.**

Genuine fact issues exist regarding whether it was objectively reasonable to restrain Croud on a gurney with a pillow, on his stomach with his hands cuffed behind his back, with a spit hood still in place, or whether he could have been repositioned on his back in a safer, supine, one arm up, one arm down position.  (Nelson Aff., Exh. 34 (Bouza Affidavit at p. 3); Exh. 27 (Tredal Declaration.))  Even if a jury were to conclude that Croud's initial positioning and restraint were objectively reasonable, there still exist genuine issues of material fact regarding whether Croud's restraint and positioning and spit hood were still objectively reasonable even after the Haldol began to take effect and he was lying tranquil on the gurney snoring. (Nelson Aff., Exh. 34 (Bouza Affidavit); Exh. 20 (Krueger depo., p. 31); Exh. 18 (Pinkoski depo., pp. 60-61.))

Defendant's expert goes to great lengths to discredit the notion of positional

asphyxiation; however, his opinion fails to take into account the multiple factors present in the instant case that compounded the risk to Croud including the presence of a pillow on the gurney, the presence of the spit hood and the prolonged length of time that lapsed. Plaintiff claims defendants violated his constitutional rights by denying him medical treatment. The law recognizes deliberate indifference to a prisoner's serious medical needs as an Eighth Amendment violation. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment's protections are afforded to pretrial detainees through the Fourteenth Amendment. Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir.2004). The refusal to provide or the excessive delay in providing a post-arrest detainee with needed medical attention may give rise to a constitutional violation actionable under § 1983 on due process grounds. Government authorities are required to provide medical care to those injured by police while being apprehended. Further, even though this duty arises under due process principles the courts have adopted the standards developed under the Eighth Amendment applicable to convicted prisoners.

"The rights implicated here [lack of medical care] are the due process protections afforded a pre-trial detainee under the Fourteenth Amendment" Gaudreault v. City of Salem, 923 F.2d at 208; Ferris v. County of Kennebec, 44 F.Supp.2d 62, 67 n. 2; Jesionowski v. Beck, 937 F.Supp. 95, 101 (D.Mass.1996). Failure to provide medical needs is subsumed under interference with access to medical attention or treatment. Defendants are "deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." Lolli v. County of Orange, 351 F.3d 410, 419 (9th Cir.2003), quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th

Cir.2002) (finding liability under § 1983 where jail officers were aware that detainee was a Type I diabetic and failed to provide medically necessary food or insulin).

In order to establish a constitutional claim for injury arising from deliberate indifference to serious medical needs, a plaintiff must "show (1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." Id. There is abundant evidence of this disregard –indeed direct interference—on this state of the record sufficient to defeat summary judgment.

## IV.   PLAINTIFF HAS ALLEGED A VIABLE *MONELL* CLAIM AGAINST DEFENDANT CITY OF DULUTH UNDER SECTION 1983.

Defendant City of Duluth contends that Plaintiffs have failed to present a viable claim for an unconstitutional policy.  Plaintiffs strongly disagree. The evidence suggests that Duluth, as a municipality, carries out a policy of using unreasonable and excessive force in its police tactics.  Officer defendants confirmed this fact in deposition testimony.

In Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the  United States Supreme Court held that, under certain circumstances, municipal liability may be imposed for a single decision or action by a municipal policymaker.  The Court made clear, however, that municipal liability attaches only when the decision-maker possesses "final authority" to establish municipal policy with respect to the action ordered.  Id. at 481, 106 S.Ct. at 1299.  The policy reflected by raises sufficient factual predicates to preclude summary judgment.

Monell's language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," and whose decisions,

therefore, may give rise to municipal liability under § 1983. <u>Pembaur</u>, 475 U.S. at 480, 106 S.Ct. at 1298-99 (citation omitted). Moreover, the United States Supreme Court rejected the reasoning of <u>Tuttle</u> by implication, in its decision in <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) by rejecting the proffered requirement of pleading more than a single instance of a constitutional violation resulting from an unconstitutional municipal policy.

Hence, Defendants' dismissal request as to Plaintiffs' <u>Monell</u>-based claim should be denied.

## A.     **The Complaint Properly Establishes Alleges A Monell Claim at Paragraph 58.**

All rights guaranteed by the Fourteenth Amendment are protected by 42 U.S.C. § 1983. <u>Matthias v. Bingley</u>, 906 F.2d 1047, 1051 (5th Cir. 1990). The Fourteenth Amendment's Due Process Clause states that no state shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. Liability can be imposed on a municipality under 42 U.S.C. § 1983 where a municipal practice or custom causes a constitutional violation. <u>Monell v. Dep't of Social Serv. Of City of New York</u>, 436 U.S. 658. 690-691 (1978). The custom may be sufficient to show a constitutional violation "even though such a custom has not received formal approval through the body's official decisionmaking [sic] channels." <u>Id.</u> at 690-691. The City of Duluth employed at least two separate policies that served to deprive Mr. Croud of his life and liberty without due process of law.

## B.     **Duluth Policy Of Not Training Officers On Use Of "Spit-Masks."**

According to the St. Louis County Medical Examiner, one of the factors in Croud's death was the application of a "spit-mask." (Nelson Aff., Exh. 24 (Medical Examiner Final Autopsy Report, (noting spit mask as possible factor in death) pg. 5.)) Plaintiff's medical expert, Dr. Tredal, also opined that the spit hood contributed to Croud's death. (Nelson Aff., Exh. 27 (Tredal Declaration); Exh. 28 (Tredal Affidavit.))

In October of 2005, the City of Duluth had a custom of making "spit-masks" available to their officers by leaving them in a box for any officer to take. (Nelson Aff., Exh. 6 (Greeman depo., pp. 385-386); Exh. 13 (Radloff depo., p. 31.) Prior to Mr. Croud's death, it was common, even "in vogue," for an officer to grab a spit-mask before heading out to patrol and they were used frequently. (Nelson Aff., Exh. 6 (Greeman depo., p. 384.)) Prior to David Croud's death, no training was provided to officers in the proper use of the spit-mask. (Id. at 387.) (Nelson Aff., Exh. 3 (Nagorski depo., pp. 160-163.)) Safariland, the manufacturer of the spit-masks, provides warnings indicating the possibility of severe, even lethal consequences if the spit-mask or spit hood is misused or misapplied. (Nelson Aff., Exh. 16 (Radloff depo., exhibit 19.))

Subsequent to Croud's death, the City of Duluth circulated an internal memorandum containing warnings substantially similar, if not identical to, the manufacturer's warnings. Nelson Aff., Exh. 6 (Greeman depo., pp. 389-390.) Officers were to sign this memo, acknowledging they had read the warnings. (Id. at 390.) This action ratifies the factual showing that Defendant Duluth utilized the spit-mask or spit hood that contained the manufacturer's (Safariland) warning as adduced during the discovery phase of this lawsuit.

This suggests that previous department policy regarding spit masks consisted of providing spit-masks to anyone, with no training, and requiring no acknowledgement that officers using the masks had seen or read the warnings.

The municipal custom at issue here was not based on a "single isolated incident." *Contrast with* City of Oklahoma City v. Tuttle, 417 U.S. 808, 821 (1985).  The evidence read most favorably to Plaintiff Croud establishes it was a common practice for the officers to obtain and employ the masks at the muster room of the Duluth Police Department at City Hall (Nelson Aff., Exh. 6 (Greeman depo., p. 384), and, the standard practice of the City was not to train the officers regarding its use.  (Id. at 387; (Nelson Aff., Exh. 3 (Nagorski depo., pp. 160-163.)

The City's policy of failing to provide  training on the masks, and failure to obtain acknowledgement that an officer using the device was familiar with warnings, led directly to the  actions which deprived Croud of his life without due process of law. Because manufacturer warnings instruct against use when subject is bleeding profusely from the mouth or nose, the ignoring of those warning by an officer who claims to be aware of the warnings constitutes deliberate indifference as a matter of law.

At a minimum, a question of fact remains at this stage of the proceedings. (Nelson Aff., Exh. 16 (Radloff depo., exhibit 19.))   The officers applying the mask and did not check the amount or evaluate the source of Croud's bleeding, other than to note it was coming from his face.  (Nelson Aff., Exh. 4 (Hamann depo., p. 61.))  If Croud was able to spit blood, as the officers testify, the blood had to be flowing from or into Croud's mouth (or possibly nose).  (Nelson Aff., Exh. 13   (Radloff depo., p. 39.))

The manufacturer warnings also instruct against leaving the subject unattended with the mask applied.  Nelson Aff., Exh. 16 (Radloff depo., exhibit 19.))  Indisputably, the officers controlled the level and manner of restraint of David Croud; indisputably, officers left Croud unattended.  (Nelson Aff., Exh. 4 (Hamann depo., p. 249.))  These decisions  Defendants' actions are expressly at odds with warnings provided by the mask's manufacturer and involve actions of more than one officer, evidence of the City's lax policy on training.

The decision of the City to base their entire training on the  unsupervised assumption that officers would read and heed  the manufacturer's sheet (Nelson Aff., Exh. 6 (Greeman depo., p. 388)) left in a box of potentially deadly devices led directly to the officers' actions that factored into Croud's asphyxiation and ultimate death.  (Nelson Aff., Exh. 24 (Medical Examiner Final Autopsy Report, p. 5); Exh. 27 (Tredal Declaration); Exh. 28 (Tredal Affidavit.))  This "affirmative link" is sufficient for <u>Monell</u> liability.  *See* 417 U.S. at 822.

## C.  <u>Policy Of Restraining People In Prone Position</u>

According to the St. Louis County Medical Examiner, another factor in Croud's death was the  face down position in which he was restrained. (Nelson Aff., Exh. 24 (Medical Examiner Final Autopsy Report, p(noting restraint position as possible factor in death) pg. 5.) Asphyxia resulting from face down restraint is also known as "positional asphyxiation."  Dr. Tredal's declaration also opines that Croud's restraint and positioning caused his death. (Nelson Aff., Exh. 27 (Tredal Declaration.))

Sgt.  Greeman testified that he had training on avoiding positional asphyxiation, but subsequently ignored the training in light of articles allegedly minimizing the dangers. (Nelson Aff., Exh. 7 (Greeman depo., pp. 211-222.)

Officer Hamann and Officer Nagorski both testified that they were "aware" of positional asphyxiation, but testified that they had no training techniques to prevent it. (Nelson Aff., Exh. 4 (Hamann depo., p. 274); Exh. 3 (Nagorski depo., pp. 171-172.)

Regardless of whether the City's policy was allowing  officers to blithely ignore the dangers of positional asphyxiation by forming their own, non-expert, opinions in the case of Greeman, or failing to train at all as in the case of Hamann and Nagorski, the City policy amounted to a failure to properly advise officers as to the dangers inherent in the restraint method.

The  municipal custom at issue was not evidenced by a "single isolated incident." *Contrast with* City of Oklahoma City v. Tuttle, 417 U.S. 808, 821 (1985).  Indeed, the practice of the City to refrain from training on risks in that method of restraint amounted to a decision by Duluth to ignore this potentially dangerous restraint method--leading directly to the officers' actions that contributed to David Croud's death.  (Nelson Aff., Exh. 24 (Medical Examiner Final Autopsy Report, (noting positional restraint as possible factor in death) pg. 5.); Exh. 27 (Tredal Declaration.))  This "affirmative link" is sufficient for Monell liability.  *See* 417 U.S. at 822.

## VI.      THE DEFENDANTS ARE NOT ENTITLED TO OFFICIAL IMMUNITY

Plaintiff has asserted viable tort claim theories seeking to recover for wrongful death under Minnesota law against the individual officers and the City of Duluth as their employer. Based on the actions of the officers, are certainly triable issues of fact.

Official immunity is a defense available to public officers who, in carrying out non-ministerial duties, act in subjective good faith. It is not available to those who carry out ministerial actions—actions that do not invoke the deliberative faculties of the officers. Hamann, Nagorski, Radloff and Greeman are not entitled to that immunity; thus the City of Duluth is not entitled to vicarious official immunity for the conduct of officers acting in the scope of official duties.

In Brown v. City of Bloomington, 706 N.W.2d 519 (Minn. Ct. App. 2005), the Minnesota appellate court held that police officers, while generally discretionary officers, are not entitled to official immunity when carrying out ministerial duties on their job.

Brown involved the failure to properly load a shotgun with less lethal rounds, causing serious injury to a Bloomington woman who was then shot by lethal shotgun slugs in the hip and buttocks.   In denying official immunity, the Minnesota court of appeals held the officer's decision to use force, that his particular and discrete act in utilizing that force did not implicate his judgment or call for an exercise of discretion so as to afford him immunity.  Thus, the officer in Brown was denied official immunity because no discretion was employed in loading his shotgun improperly.

The second prong available for defeating official immunity is the bad faith or improper conduct (malice) of the officer.  Thus, even a discretionary act can lose the shield of official immunity when carried out so unreasonably as to implicate malice.

It appears from the overwhelming facts in the record that Hamann and/or Nagorski simply sought to punish Mr. Croud for being intoxicated on the streets of Duluth.  The deposition testimony of  bystanders and passersby makes it clear that Mr. Croud was not "resisting" or fighting these defendant officers.   Moreover, the failure of Radloff to follow the directions on the spit hood (pursuant to Greeman's directions)  is equivalent to the misleading of the less lethal shotgun in Brown.  The act of  negligently applying the spit hood  according  to  manufacturer  warnings  does  **not**  implicate  judgment  or deliberative faculties by the police officer.

The official immunity doctrine provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of willful or malicious wrong." Elwood v. Rice County, 423 N.W.2d 671 (Minn.1988), 423 N.W.2d at 677 (quoting Susla v. State, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976)).  The burden is on the party asserting official immunity to provide the Court with facts supporting the claim of immunity.

The defendant officers'  conduct in this arrest—an arrest apparently motivated by a pattern of arresting Native American person (especially those intoxicated), does not sustain the burden of the defense. A party asserting an immunity defense bears the burden of demonstrating that he or she is entitled to immunity. Id. at 314 (citing Rehn v. Fischley, 557 N.W.2d 328, 333 (Minn. 1997)).  Moreover, substantial facts supporting an outright denial of official immunity remain based on the testimony of the bystander and taxi driver regarding the actions of Nagorski and Hamann in slamming the Decedent to the ground, and in slamming him on the trunk of the squad car after he was already

43

handcuffed—resulting in Croud slumping to the ground.

As the Minnesota Supreme Court held in <u>Rico v. State</u>:

[w]hen a party alleges that an official is not entitled to official immunity because the official acted maliciously or willfully, this court "must determine whether a genuine issue of material fact exists as to whether [the official's] actions could constitute a willful or malicious wrong."

<u>Rico v. State</u>, 472 N.W.2d 100, 107 (Minn. 1991).  Moreover, the grant of vicarious official immunity is a policy matter, thus it is not automatically afforded governmental employers for their employees conduct. <u>Anderson v. Anoka Hennepin Independent School Dist. 11</u>, 678 N.W.2d 651, 187 Ed. Law Rep. 268 (Minn. 2004). However, because under these facts, none of the officers have made an adequate showing to support official immunity, the claim must be denied as to the City of Duluth.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request this Court deny Defendant Officers and City of Duluth's motion for summary judgment.

8 December 2009

  s/Albert T. Goins
Albert Turner Goins, Sr. (#126159)
**GOINS LAW OFFICE, LTD.**
301 Fourth Avenue South
Suite 378N
Minneapolis, MN 55415
(612) 339-3848
(612) 339-3853 (Fax)

Teresa J. Nelson (MN #269736)
ACLU of Minnesota
450 North Syndicate Street,
Suite 325
St. Paul, MN 55104

Telephone: (651) 645-4097

-and-

 John C. Goetz, # 0035634
Schwebel, Goetz & Sieben
5120 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 377-7777

**ATTORNEYS FOR JAMES CROUD, TRUSTEE
OF THE ESTATE OF DAVID CROUD**